IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

HAILEY M., by and through her )    CIVIL NO. 10-00733 LEK-BMK
mother, MELINDA B.,           )
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
KATHRYN MATAYOSHI, in her     )
official capacity as          )
Superintendent of the Hawai'i )
Public Schools; and           )
DEPARTMENT OF EDUCATION,       )
STATE OF HAWAI'I,             )
                              )
          Defendants.         )
_____ )


**ORDER AFFIRMING THE HEARINGS OFFICER'S
NOVEMBER 12, 2010 DECISION**

        Before the Court is an appeal by Plaintiffs Hailey M.

("Hailey" or "Student"), by and through her mother, Melinda B.

("Mother", both collectively "Plaintiffs"), of the Administrative

Hearings Officer's ("Hearings Officer") Findings of Fact,

Conclusions of Law and Decision ("Decision"), filed on November

12, 2010.[1]  Plaintiffs filed their Opening Brief in the instant

case on May 3, 2011.  Defendants Kathryn Matayoshi, in her

official capacity as Superintendent of the Hawai'i Public

Schools, and the Department of Education, State of Hawai'i

(collectively "the DOE" or "Defendants") filed their Answering

_____

        [1] The Decision can be found in the Administrative Record on
Appeal ("ROA") at 129-95 and as Exhibit A to the Complaint (dkt.
no. 1).

Brief on June 15, 2011, and Plaintiffs filed their Reply Brief on July 15, 2011. The Court heard oral argument in this matter on August 1, 2011. Appearing on behalf of Plaintiffs was Irene Vasey, Esq., and appearing on behalf of Defendants was Berton Kato, Esq. After careful consideration of the parties' briefs, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY AFFIRMED.

**BACKGROUND**

I. **Factual and Administrative Background**

At the time of the Decision, Student was sixteen years old, and a sophomore in high school. The Decision addresses her attendance at Kalani High School ("Kalani"), Niu Valley Middle School ("Niu Valley"), and Aina Haina Elementary School, as well as at various private providers.

Student has been eligible for special education services since 1999. She was initially qualified under the disability category "mental retardation." In November 2006, Mother sought an independent neuropsychological evaluation by Peggy Murphy-Hazzard, Ph.D, who concluded that Student was not mentally retarded, but had severe learning disabilities, including, among others, dyslexia, language delay, and Central Auditory Processing Disorder ("CAPD"). [ROA at 287.] Following this diagnosis, Mother paid for several private providers, including FastForward, private speech therapy, and in 2010, the

Lindamood-Bell Summer Clinic on Maui.

The DOE conducted a reevaluation in 2008, and in June 2008, the Niu Valley Eligibility Team found Student eligible for special education services under the category "specific learning disability." During the period from February 8, 2008 to February 8, 2010, Niu Valley developed Individualized Education Programs ("IEPs") on April 30, 2008, June 26, 2008, October 24, 2008, April 9, 2009, May 21-22, 2009 and June 22, 2009, and Kalani developed IEPs on September 9/October 1, 2009, November 10, 2009, December 2, 2009, and April 20, 2010.

Student received extended school year ("ESY") services in 2008 and 2009, and speech services during Summer 2009 ESY. Kalani placed Student in a general education inclusion classroom for the first quarter of her ninth grade year, where she was taught by general education teachers with support from special education teachers and an aide assigned to her. Student received the general education curriculum, but her work was modified to the third grade reading level as an accommodation. Student, however, struggled with the general education curriculum. Kalani then moved her to a special education room for higher functioning special education students and she was still on a diploma track.

On February 8, 2010, Plaintiffs filed a Request for Impartial Due Process Hearing ("RIH") with the Office of Administrative Hearings, Department of Commerce and Consumer

Affairs.  [ROA at 12-17.]  The RIH states that:

> This Request for an Impartial hearing is
> challenging any and all IEP's in effect from
> February 8, 2008 to present as inappropriate to
> meet Hailey's educational needs and provide her
> with educational benefit, thereby denying Hailey
> her right to a free and appropriate education.

> This request for an impartial hearing is also
> challenging the past two years of "measurable"
> goals and objectives as incorrect and/or vague in
> their assessment of Hailey's skill level, and as
> not capable of being measured, therefore worthless
> in assessing whether or not Hailey was making <u>any</u>
> educational process at all.

[ROA at 16.]  The RIH sought:

1. Reimbursement from DOE for any and all out-
   of-pocket expenses relating to provision of
   auditory remediation training and private
   evaluations during the past two years,
   including costs of transportation.

2. Provision of Lindamood-Bell summer
   remediation training, including any
   transportation, lodging and related costs
   incurred [by] Hailey and her mother, at DOE
   expense

3. Continued compensatory education until Hailey
   achieves grade level abilities in reading and
   in math

3. A DOE placement which includes:
   1:1 educational support in all core classes
   Multisensory teaching of all subjects with
   methodology similar to Orton-Gillingham or
   Barton.
   Extended School day as needed to address all
   core subjects.
   Goals and Objectives which are both
   appropriate and measurable
   OR
   Placement in private school, (i.e. Assets),
   which addresses the needs of students with
   dyslexia and remediating reading disorders at

DOE expense.

4.    Speech/language services provided
      individually at 90 minutes per week

5.    Reimbursement for CAPD remediation to be
      provided as 60 hours of the Kid Potential
      Program for Earobics

6.    Reimbursement of all attorney fees and costs
      incurred in pursuing the resolution to all
      the issues referred to above, payable to
      Irene E. Vasey, Attorney at Law, A Law
      Corporation.

[ROA at 17.]

At a pre-hearing conference held on March 18, 2010, the
Hearings Officer determined Plaintiffs' RIH was insufficient, and
ordered Plaintiffs to submit an addendum with specific dates for
the challenged IEPs and the reasons those IEPs did not provide a
FAPE, which Plaintiffs submitted on March 23, 2010.  [ROA at 20-
25.]  Plaintiffs identified the following: (1) December 2, 2009
IEP, December 14, 2009 Prior Written Notice/January 13, 2010 IEP;
(2) November 10, 2009 IEP meeting; (3) October 1 and September
30, 2009; (3) August 14, 2009 IEP meeting; (4) June 22, 2009 IEP
meeting; (5) May 21 and 22, 2009 IEP meeting; (6) April 9, 2009
IEP; (6) October 24, 2008 IEP; (7) August 1 and 5, 2008 IEP;
(8) June 26, 2008 IEP; (9) April 30, 2008 IEP.  [Id.]

The due process hearing convened on September 20, 21,
22, 23 and 27, 2010.  [Decision at 3-4.]  In his sixty-seven page
Decision, the Hearings Officer framed the issue as whether the
specified IEPs offered Student a FAPE.  [Decision at 4.]  The

Decision summarized Student's history of private and DOE

evaluations and IDEA services. [Id. at 11.] The Hearings

Officer found, *inter alia*:

> 1- Student is 16 years of age and is eligible
> to receive special education services under Hawaii
> Administrative Rule ("HAR") Chapter 60 under the
> category of Specific Learning Disability.
> 2- Student is entering her sophomore year at
> the Home school.
> 3- Student has been identified as eligible
> for special education since 1999.
> 4- In 2005, the Student was made eligible to
> receive special education services under the
> category of mental retardation. This
> determination was made pursuant to a reevaluation
> conducted by Respondent's contracted providers.
> . . . .
> 10- Since April 2008, Student's IEP has met
> over 15 times resulting in 13 updated IEPs.

[Id.]

In the Decision, the Hearings Officer divided

particular findings of facts and conclusions of law into the

discussion of the individual challenged IEPs. In the Decision's

general Conclusions of Law, the Hearings Officer first addressed

whether the DOE failed to evaluate Student in all areas of

suspected disability. [Decision at 55.] The Hearings Officer

concluded as follows:

> Student had entered the Intermediate Home
> School from the Original Home School with the
> qualifying designation of "mental retardation"
> determined in 2005. In 2008, the Intermediate
> Home School IEP team reevaluated Student and
> continued Student's eligibility under the category
> of specific learning disability. Petitioners did
> not prove by a preponderance of the evidence that
> Respondent failed to evaluate Student in all areas

6

of suspected disability in that there was no
credible or persuasive evidence presented at the
hearing to indicate that the Original Home School
IEP Team was presented with any concerns regarding
the need to have Student undergo any additional
assessments for the 2005 eligibility
determination.

Furthermore, the IEPs put in question in the
instant matter were driven by the needs of the
Student, not by the eligibility determination.
Because Petitioners failed to present any evidence
to the contrary, with respect to the 2005
eligibility determination, the Hearings Officer
must conclude, on the basis of testimony by
Student's Special Teacher's testimony, that the
diagnostic categorization of Student was done for
the determination of eligibility under the IDEA
and that irrespective of the eligibility category,
IEPs are based on the specific needs of the
particular child and not on a predetermined
education plan based upon the eligibility
category.

. . . .

In light of the above, the Hearings Officer
must conclude that both the issue of an alleged
failure by Respondent to evaluate Student in all
suspected disability, and Petitioners' demand for
reimbursement for costs for services between March
2006 and January 2008, allegedly paid by
Petitioners, are barred by the applicable statute
of limitations.

[Id. at 56-57.]

Next, the Hearings Officer addressed whether Student's

ESY services were appropriate to meet Student's educational

needs. He found that certain periods of ESY were not detailed in

the RIH ("Winter ESY" and "April 2008 IEP") and, as those issues

was not properly raised, would not be considered. [Id. at 58.]

With respect to the other ESY periods, the Hearings Officer

concluded that Student had a poor attendance record during the Summer 2009 ESY, when she attended eight sessions and was absent sixteen times. [Id.] He then concluded as follows:

> As to the question of whether the ESY programs were designed to meet the Student's needs, the goal of all the ESY programs was to maintain [Student's] emerging skills in reading comprehension and math computation and reasoning. Speech and language services were also provided to meet Student's needs with respect to expressive and receptive language.

> For the reasons stated above, the Hearings Officer finds that the ESY Programs offered by Respondent, and often rejected through non-attendance by Petitioners, are appropriate to meet the unique needs of the Student.

[Id. at 60.]

The Hearings Officer then turned to whether Mother was treated as an equal participating member of the IEP team, and concluded:

> As with the IEPs detailed infra, Petitioners are claiming that failure of the remaining IEP team members to "rubber stamp" each of Mother's demands into the IEP results in "not including Mother as a full member of the IEP team." There is no such mandate under the IDEA.

> . . . .

> Finally, the fact that there were 13 IEPs in the span of a two year period speaks volumes as to Respondent IEP members' consideration of Mother's concerns.

> In light of the above, the Hearings Officer must find that Petitioners failed to prove by a preponderance of the evidence that Mother was not included as a full member of the IEP teams herein discussed.

[Id. at 61-63.]

The Decision next addresses the appropriateness of Student's annual goals and objectives. The Hearings Officer rejected Plaintiffs' arguments regarding the failure to adjust Student's annual goals or objectives when her eligibility category was changed from mental retardation to specific learning disability in 2008. [Id. at 63.] The Decision states:

> As Student's special education teacher persuasively testified, the diagnostic categorization of a child is done to for the purpose of determination of eligibility under the IDEA. Irrespective of the category of eligibility, the IEPs are based on the needs and strengths of the particular child. Thus, the creation of the concept that an IEP is "needs driven."
>
> . . . .
>
> In light of the above, as well as the discussions of the individual IEPs at issue, the Hearings Officer must conclude that Petitioners failed to prove by a preponderance of the evidence that Student's Annual Goals and Objectives were inappropriate.

[Id.]

The Hearings Officer next declined to address the appropriateness of Student's transition plan, as it was not raised in Plaintiffs' RIH. [Id.]

Thereafter, the Decision discusses Plaintiffs' arguments regarding the least restrictive environment, and Student's inclusion in a regular classroom with a regular education teacher, special education teacher, and an aide that

worked exclusively with Student.  [Id. at 64.]  The Hearings

Officer concluded that:

> Essentially, all her teachers in the
> inclusion class reported that Student was being
> overwhelmed; and coupled with Student's repeated
> absences, Student found it difficult to keep up
> with the class and was failing.  For all of these
> reasons, it was determined that Student was to be
> placed in the special education ACE diploma class
> where the student began to do well.  Mainstreaming
> opportunities for the student included non-
> academic activities such as electives, lunch,
> advisory, passing, recess and all school related
> activities.
>
> . . . .
>
> The Hearing Officer finds that in light of
> Student's numerous problems in the regular
> education setting, Petitioners advocacy in the
> instant matter for the inclusion setting is
> misplaced.  Directly contrary to Petitioners
> current position on the inclusion setting is the
> fact that at the time, even Mother felt that "the
> inclusion class that [Student] was placed in at
> the beginning of the school year **did not meet her
> needs**." (emphasis added)  RE 13, page HM236
> Petitioners cannot be allowed to claim the
> inappropriateness of the inclusion setting at the
> time and turn around and claim Respondent failed
> to provide FAPE for not leaving student in the
> inclusion setting.  It seems counterintuitive.
>
> For the above stated reasons, the Hearing
> Officer must conclude that Student's placement in
> the ACE diploma class was appropriate to meet the
> needs of Student and that Respondent did not
> violate the mandate of least restrictive
> environment provisions of the IDEA.

[Id. at 65.]

The Hearings Officer next addresses Plaintiffs' request

for compensatory education and reimbursement of Mother's costs

from February 2008 through February 2010. He concluded that:

> The difficulty in this case is that Petitioners have not proved the nature or extent of Student's "educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." Petitioners are claiming a failure to provide appropriate services from February 2008 to February 2010.
>
> Further, any services arguably not provided or missed by Petitioners can be attributed in large part to Student's dismal attendance record. As mentioned before, Petitioners have failed to make a commitment to receive services under the IEPs herein listed by failing to have Student attend service programs, or even school, on a regular basis. The Student has failed to attend school regularly for at least the last two years and therefore it is not unreasonable to conclude that the Student would fail to take advantage of any compensatory services awarded.
>
> In this case, the issue of compensatory education is mooted by the fact that Petitioners failed to meet their burden of persuasion to show that the IEPs at issue were in fact inappropriate to meet the needs of Student.

[Id. at 66.]

The Hearings Officer concluded that Plaintiffs failed to prove that the challenged IEPs denied Student a FAPE. The Decision states that:

> Petitioners have not shown that the IEPs between February 8, 2008 and February 8, 2010 had inappropriate goals and objectives; that the amount of direct and related services Student needs has not been met by Respondent's offer; that ESY services were not properly defined; and that Student's proposed placement was inappropriate.
>
> Respondent's offers of FAPE relating to the proposed programs and placement of the Student

between February 8, 2008 and February 8, 2010 were
appropriate and allowed Student to achieve
meaningful educational gains in the least
restrictive environment.

[Id. at 67.]  The Hearings Officer therefore dismissed the RIH.

[Id.]  The instant action followed.

## II.  **Plaintiffs' Opening Brief**

Plaintiffs emphasize that Student was miscategorized as
mentally retarded, but that, when she was recategorized in 2008,
her services did not change.  Plaintiffs also stress the need for
compensatory education and reimbursement for the Lindamood-Bell
summer clinic.  They state that Student currently reads at the
fourth grade reading level, and is entering her junior year in
high school.  Her goal is to graduate from high school and attend
college, which Plaintiffs believe is possible with proper
educational remediation.  [Opening Br. at 3.]

Specifically, Plaintiffs argue that: Student was
untimely and inadequately evaluated; Student's ESY services were
inappropriate and in violation of the IDEA, while the Lindamood-
Bell summer clinic was an appropriate placement; Student's Goals
and Objectives were neither measurable nor meaningful; Student
was not placed in the Least Restrictive Environment; Mother was
not treated as an equal participant of the IEP team; and
Student's transition plan is not sufficient to achieve her IEP
goal.

Plaintiffs argue that the Court should not accord

deference to the Decision because, "[d]espite the length of the Decision (67 pp.), the findings of the Hearing Officer were neither thorough nor careful." [Opening Br. at 34.] Plaintiffs assert that the conclusions of law contain no analysis of conflicting evidence, while the testimony of Plaintiffs' experts is ignored. [Id.] Plaintiffs also describe a "pro Defendant bias," because Mother is described as "demanding" and is "blamed throughout for her daughter's academic failures." [Id.]

A. **Inadequate and Untimely Evaluations**

Plaintiffs first argue that Student was inadequately and untimely evaluated resulting in misidentification of her disability and in appropriate IEPs. They assert that the DOE has an ongoing obligation to evaluate students in all areas of suspected disability, and that, once provided with Dr. Murphy-Hazzard's neuropsychological report, it should have investigated the discrepancy in Student's eligibility categories and assessed its impact on her education plan. [Id. at 14.] Instead, the DOE did nothing from 2006 to 2008, keeping Student in a fully self-contained special education setting, with an IEP in place "developed for a mentally retarded student." [Id. at 15.]

Plaintiffs acknowledge that the IDEA does not give a student the right to a correct disability classification. [Id. (citing 20 U.S.C. § 1412(a)(3)(B); 34 C.F.R. 300.111(d)).] Plaintiffs discuss the Ninth Circuit's holding in <u>Weissburg v.</u>

Lancaster School Dist., 591 F.3d 1255 (9th Cir. 2010), regarding

procedural violations resulting from disability classifications.

They argue that the DOE's failure to make a timely reassessment

of Student's disabilities resulted in more than procedural error

– they argue that substantive harm was also an outcome of

Student's incorrect assessment.  [Id. at 15-16.]  According to

Plaintiffs, "Hailey's misclassification as a mentally retarded

student had a detrimental effect on the formulation of Hailey's

IEP speech and language goals and objectives, as well as those

goals and objectives relating to her academic development."  [Id.

at 16.]

They then address whether Student has CAPD, arguing

that the Hearings Officer incorrectly concluded that she did not.

According to Plaintiffs, the Hearings Officer concluded Student

did not have CAPD, "relying solely on evidence from one DOE

audiologist, in practice for less than one year."  [Id. at 17.]

> In coming to his conclusion, the Hearing Officer
> makes no attempt to reconcile the diagnosis of
> CAPD included in the 2001 evaluation by Dr. Ohara,
> (Kaiser M.D.), the 2003 evaluation by Dr. Critz,
> (Kaiser Ph.D.), the 2006 neuropsychological
> evaluation by Dr. Murphy-Hazzard, (Psy.D.,
> Learning Center of Hawaii) and the 2008 updated
> evaluation by Dr. Tyson (Psy.D., Learning Center
> of Hawaii), or the opinion of the expert speech
> pathologist, all of whom have diagnosed Hailey
> with severe audiological processing issues.

[Id.]

According to Plaintiffs' experts, if Student's IEPs had

14

provided appropriate attention to the auditory processing, her language skills would have been expected to improve.  [Id. at 18.]

  B.   **ESY Services Were Inadequate**

     Next, Plaintiffs argue that Student's ESY services were in violation of the IDEA, both procedurally and substantively. Procedurally, Plaintiffs claim that the IEPs' ESY descriptions offer no specific location of services, duration of services or type of educational setting being offered.  Where the IEPs stated services were "to be held on campus" they were insufficient because such description "is not a placement or an[] educational setting on the continuum of least restrictive environments." [Id. at 19 (citing W.G v. Board of Trustees of Target Range School District No. 23, 960 F.2d 1484, 1485 (9th Cir. 1992)).] Plaintiffs argue that from February 2008 to February 2010, none of Student's ESY services met the standards mandated under the IDEA because they failed to provide an adequate educational program appropriate to meet her needs, and contained insufficient descriptions of what the ESY services were.  [Id. at 19-20.]

     Plaintiffs fault the Hearing's Officer's conclusions that Student's poor attendance record was a cause of her educational problems and that her absences from ESY programs negated their inadequacy.  Plaintiffs contend that "the majority of Hailey's absences were caused by one of two factors: 1) The

inappropriateness of the offers themselves[,] 2) Somatic reactions (i.e., stomach aches and headaches) resulting from Hailey's anxiety and frustration about not succeeding in the classroom." [<u>Id.</u> at 21.]

Next, Plaintiffs assert that the Summer 2010 Lindamood-Bell Summer Clinic was the appropriate ESY program for Student. Plaintiffs' expert, Elizabeth Cranyon, explained that Student improved in the majority of tests post-program. [<u>Id.</u> at 22-23 (citing ROA, 9/22/2010 Trans., at 321-422).] Plaintiffs assert that Student's skills and test scores would continue to rise if she were allowed to continue with the remedial instruction. [<u>Id.</u> at 23-24.]

### C. <u>The IEP Goals and Objectives Were Not Measurable or Meaningful</u>

Plaintiffs argue that the Goals and Objectives portions of Student's IEPs were not measurable or meaningful. Plaintiffs' expert, Ms. Cranyon, also testified that Student's December 9, 2009 IEP had no objective baseline from which to determine whether or not she was making progress, and that the goals were very broad and general. [<u>Id.</u> at 4-25 (citing ROA, 9/22/10 Trans., at 274, 375).] Plaintiffs' speech pathology expert, Mary Marasovich, stated with respect to the August 14, 2009 IEP, that there was no goal to match her need to communicate her basic thoughts intelligibly. [<u>Id.</u> at 25 (citing ROA, 9/22/2010 Trans., at 272-73).]

D.  **Least Restrictive Environment**

Plaintiffs next argue that Student was not placed in the Least Restrictive Environment as required by the IDEA because she was not permitted to remain in mainstream immersion classrooms.  In August 2009, Student's IEP team decided to place her in an inclusion classroom (a regular education classroom with individualized special education supports) the first semester of her ninth grade school year.  Mother testified at the hearing that:

> I was excited coming into Kalani that was one of our -- that she was going to be in regular education with support.  So my daughter Hailey was ecstatic because she's for years wanted to be in regular education class, that was her goal, and Kalani put her in that.  And then she wasn't doing very well.  Her grades weren't good and they said she had to be taken out.

[Id. at 27 (quoting ROA, 9/20/2010 Trans., at 113).]

Plaintiffs argue that Student's inclusion lasted only one semester because the DOE witnesses blamed her failure to thrive on the pace of the class, but no additional services or modifications to her IEPs were added in an effort to support her and keep her in a regular education setting.  [Id. at 27-28.] Plaintiffs contend that she needed one-to-one instructional support in a multisensory setting.  [Id. at 28.]

E.  **Mother Not Treated as Equal Participating Member**

Plaintiffs contend that Mother was not treated as an equal participating member of the IEP team.  According to

17

Plaintiffs, Mother "testified over and over about her feelings of helplessness and inability to make Hailey's IEP team listen to her concerns. She has paid out tens of thousands dollars on her own for private evaluations, supplemental programs, and professional remedial instruction[.]" [Id. at 29.]

### F.  Transition Plan Was Not Sufficient

According to Plaintiffs, the Hearings Officer concluded that "the issue of Student's transition plan was never brought up as an issue in Petitioners' request for impartial hearing. As such Petitioners' will not be permitted to raise this issue after the fact." [Id. at 30 (citing Decision at 63).] Plaintiffs state that transition services are a part of the provision of FAPE, and as such should always be a factor considered in determination of whether an IEP is appropriate. They note that each of Student's IEPs contains a "transition plan," and that Student's plan to attend college upon graduation was discussed with the IEP team on multiple occasions. [Id. at 30-31.] Plaintiffs contend, however, that the IEPs in question contain no designated course of study to achieve the goal, and that Student is "currently in tenth grade with the academic skills of a fourth grade student." [Id. at 31.]

### G.  Compensatory Education as Remedy

Finally, Plaintiffs argue that, due to the DOE's failure to provide Student with a FAPE, they are entitled to

reimbursement for their expenses incurred at the Lindamood-Bell
Maui Clinic, and for future compensatory education, including
continued Lindamood-Bell attendance.  Plaintiffs claim that
Student had not made educational progress in the two years before
Mother enrolled her in the Lindamood-Bell summer program, and
that Student has shown her ability to progress rapidly when given
proper instruction.  [Id. at 32-32.]  Specifically, Plaintiffs
are requesting:

> 1.    Reimbursement of 2010 Summer Lindamood-Bell
> program tuition ($22395.00), including all related
> travel costs ($7629.45) and mileage (see P.Ex. 48,
> 49)
>
> 2.    Reimbursement for all out-of-pocket expenses
> relating to provision of recommended education
> programs and services private evaluations for the
> period February 2008 to February 2010 ($983.00)
> (see P. Ex. 50 p. 383-384)
>
> 2.    Reimbursement from DOE for any and all
> out-of-pocket expenses relating to provision of
> recommended education programs and services
> private evaluations for the period February 2008
> to January 2008 ($19,820.00), including costs of
> transportation. (see P. ex. 50, p. 380-382)
>
> 3.    Provision of 90 minutes per week of
> speech/language services provided 1:1 by a
> qualified speech pathologist.
>
> 4.    Reimbursement of all attorney fees and costs.
>
> 5.    Compensatory and remediation education of
> Lindamood-Bell Summer 2011 and 2012 Lindamood Bell
> Clinic (recommended hours), Regular School Year
> 2011-2012 and School Year 2012-2013 Lindamood-Bell
> Instruction (recommended hours) and reimbursement
> of any travel costs incurred.

[Id. at 35-36.]

In conclusion, Plaintiffs urge the Court to reverse the Decision and to issue an order finding that the DOE denied Student a FAPE.

## III. **Defendants' Answering Brief**

In Defendant's view, the Hearings Officer's Decision must be affirmed because: (1) the Decision correctly determined that the DOE offered Student a FAPE; and (2) the Decision was thorough and careful and contained an impartial consideration of all the evidence and testimony. [Answering Br. at 1.] Defendants characterize the issues raised as follows:

A. Whether Hailey M. was properly and timely evaluated.

B. Whether Hailey M.'s ESY program was appropriate.

    1. Whether Hailey M.'s ESY was in Violation of the IDEA.

    2. Whether the selection of Hailey M.'s Reading Program was within the sound discretion of the DOE.

    3. Whether the Hearings Officer correctly ruled that based on Student's past attendance record that to award her ESY would have been futile.

C. Whether Hailey M.'s goals and objectives were measurable and meaningful.

D. Whether Hailey M.'s placement was in the Least Restrictive Environment.

E. Whether Hailey M.'s mother was treated as an equal participant of Hailey M.'s IEP Team.

F. Whether the transition plan was raised as an issue in the due process request and at the administrative hearing below, and, if not, whether Plaintiffs can now raise it for the first time in this appeal.

G. Whether an award of compensatory education is appropriate in this case.

    1. Whether certain claims which pre-date February 8, 2008 are barred by the two-year

statute of limitations.

[_Id._ at 4.]

A.   **Defendant's Recitation of the Facts**

The DOE states, in pertinent part, that:

7.   Student had a poor attendance record at both Niu Valley and Kalani during the regular school year.

8.   Mother asked for ESY services and it was given to Student for the summer ESYs for 2008 and 2009.  Student missed many days of ESY.

9.   Student was also given speech services during summer ESY for 2009 but did not attend any of the speech therapy sessions offered during summer ESY 2009.

10.   Student demonstrated needs in reading comprehension, writing, math, and speech/language. Student also had difficulty with socialization for which she received counseling.

11.   Niu Valley placed Student in a special education resource room for her core classes.

12.   At Mother's request, Kalani placed Student in a general education inclusion classroom for the first quarter of her ninth grade year where she was taught by general education teachers with support from special education teachers. Student received the general education curriculum but her work was modified to the 3rd grade reading level as an accommodation.

13.   Even with this accommodation, student struggled because of the pace of the general education curriculum.  Consequently, Student was placed in a special education room for higher functioning special education students.  The class was still on a diploma track but the pace was much slower.

14.   Student did well academically and socially in this diploma track special education

21

class.

[Id. at 10-11.]

The DOE also asserts that the IEPs in question offered Student a FAPE. According to the DOE:

Both the Niu Valley and Kalani IEPs were appropriate and were reasonably calculated to allow Hailey M. to receive educational benefit.

At Niu Valley, under the IEPs developed in 2008 and 2009, Hailey M. would receive the following services:

1. Special education for 880 minutes per week.

2. Speech Services for 360 minutes/quarter or 40 minutes/week.

3. Counseling services for 240 minutes/ quarter or 25 minutes/week.

4. Supplemental Services, including, extra time to respond, direct teaching (one:one) when she doesn't understand new concepts, review and repeat vocabulary concept, allow Hailey M. to take breaks when needed, repeat and explain instructions, give oral and visual cues, provide visual supports to aid verbal instructions, provide opportunities for mastery and generalization of new concepts, provide information in smaller chunks, material should be presented with a multi-sensory approach, monitor the speed and amount of information presented so as not to overwhelm, read tests aloud, extend time for large projects. All these accommodations were placed in Hailey M.'s IEP to address her unique needs.

5. An increase of speech services from 360 to 450 minutes per quarter.

6. ESY for the summer intercession for 2008 and 2009. However, Hailey M. did not attend many of these ESY days.

7.    30 minutes of speech services during ESY for the summer intercession for 2008 and 2009. However, Hailey M. did attend any of the speech sessions.

8.    ESD services, consisting of the SONDAY and SRA reading programs and math tutoring.

At Kalani, Hailey M. received the following:

1.    The same special education, speech and counseling services.

2.    The same accommodations.

3.    A Study Skills class taught by a special education teacher.

4.    Morning and Afternoon Academic Assistance to help Hailey M. with her courses.

5.    Achieve 3000 a reading intervention program.

[Id. at 34-35.]

Defendants note that there are many issues raised in Plaintiffs' RIH, covering two-years worth of IEPs, but only some of these issues have been addressed in Plaintiffs' Opening Brief. [Id. at 11.]

## B.    Student Was Properly and Timely Evaluated

The DOE first discusses whether the alleged miscategorization gives rise to a claim under the IDEA.  The DOE claims that Plaintiffs' reliance on Weissburg v. Lancaster School District, 591 F.3d 1255 (9th Cir. 2010), is misplaced, because that case involved a claim for attorney's fees and whether plaintiffs were the prevailing party where the hearings officer

specifically ruled that there was no denial of FAPE as a result
of the misclassification of a student's disability category.
[Id. at 12.]  Weissburg involved a California statute which
required special education teachers to possess credentials
specific to a child's disability classification, and according to
the DOE, there is no such statute in Hawaiʻi.  The DOE asserts
that under the IDEA, a student has no legal right to a particular
classification, and a misdiagnosis would not be a denial of FAPE.
[Id. at 13.]

       Next, the DOE claims that the IEPs addressed Student's
unique educational needs, regardless of her disability
classification, because IEPs are "needs driven."        The DOE
also addresses Plaintiffs' claims that Student had CAPD.
Contrary to Plaintiffs' claim that the DOE relied on a single
assessment to base its conclusion that Student did not have CAPD,
the DOE argues that its expert, Dr. Kristine Takekawa, was the
only expert audiologist called as a witness at the hearing, and
her audiological assessment was based on three audiological tests
consisting of four subtests; further, her report concerning her
audiological testing was the only audiological report introduced
into evidence.  According to the DOE, Plaintiffs' experts were a
Speech/Language Pathologist, two Psychologists, and a Lindamood
Bell reading expert, and none of the reports relied upon by
Plaintiffs to prove that Student had CAPD were introduced.  [Id.

at 15-16.]  The DOE insists that Student is not suffering from
CAPD, and that Plaintiffs are not entitled to reimbursement of
expenses to remediate her CAPD condition, for example, the costs
for such programs as FastForward and Kids Potential.  [Id. at
16.]

C.  **ESY Program Was Appropriate**

The DOE emphasizes that the Hearings Officer
specifically found that Student's ESY programs for summer 2008
and 2009 were appropriate, and that she did not attend many of
the ESY days.  With respect to Plaintiffs' claim that the DOE
failed to spell out the dates, frequency, services and location
of the services, the DOE asserts that the claim is not supported
by the record and that the IEPs adequately described the
services.  [Id. at 18-19.]

The DOE also argues that it submitted ample evidence
supporting the Hearings Officer's finding that, with respect to
the shorter intercession periods, Student exhibited very little
regression and was able to recoup any lost skills within a short
period of time, and therefore, the IEP team was justified in
concluding that she did not qualify for ESY services with respect
to the shorter intercession periods.  The DOE also claims there
was ample evidence that Student would not take advantage of the
ESYs if given to her.  [Id. at 22.]

D.   **The IEPs' Goals and Objectives Were Measurable and Meaningful**

        The DOE argues that, to the extent Plaintiffs claim that the goals and objectives were not measurable or meaningful because there were no "baselines" stated in the IEPs, or that there are no "grade equivalencies" specified in the IEPs, Plaintiffs are not entitled to any relief.  According to the DOE, the IDEA does not specifically require "grade equivalencies." Further, the IEPs described Student's present strengths and needs, essentially describing what she could and could not do in various subject areas tested.  In stating the goals and objectives in this fashion, the DOE claims it was giving a much more descriptive "baseline" than just providing her "grade level."  [Id. at 23.]

E.   **Least Restrictive Environment**

        The DOE argues that the inclusion classroom was not the "right setting" for Student.  It claims that at the end of the quarter in which she was in the inclusion classroom, her special education teachers and her regular education teachers met and all agreed that Student was struggling to keep up with the regular education students, and that she would benefit from a switch to an ACE Diploma track classroom for all her core classes.  The ACE Diploma track included higher functioning special education students who were all scheduled to graduate with a high school diploma.  [Id. at 27-28 (citing Testimony of Melissa Marques, Tr.

Volume V at 795:11-25, 796:1-5, and 797:1-24).] According to the DOE, Student "flourished in the ACE diploma class academically, socially and in her self confidence and esteem." [Id. at 28.]

### F. **Mother Was Treated As an Equal Participant**

Next, the DOE claims that "Mother insisted on calling numerous IEP meetings." [Id.] During the two-year period from 2008 to 2010, there were fifteen meetings and thirteen IEPs developed. The IEP team acceded to many of Mother's requests, including:

> Summer ESY for 2008 and 2009; an inclusion class for one quarter; an after school program at Niu Valley, which included two reading intervention programs and a math tutoring program; a Morning and Afternoon Academic Assistance program at Kalani; a Study Skills special education class; an ACE Diploma class at Kalani, which combined high functioning peers and special education at a slower pace than the regular education inclusion class; and the Achieve 3000, a computer based reading intervention program that was specifically directed to Hailey M.'s reading level and covered reading comprehension, fluency, decoding and vocabulary.

> Some things the DOE did not agree with Mother on were the choice of a reading intervention program, the ESY during the regular school year, and her classroom setting.

[Id. at 28-29.]

The DOE notes that the Hearings Officer found Mother was not denied participation in the IEP meetings, "but became litigious when the IEP team refused to agree to all her demands." [Id. at 29.]

27

### G. **The Transition Plan Is Not Before the Court**

The DOE asserts that whether the transition plan in the IEPs was deficient was not raised in the RIH, and therefore, cannot be raised in this appeal. In any event, the DOE submits that the IEPs sufficiently describe the transition plan, stating that Student wants to attend a "post-high school institution," and that she has at all times been programmed and on track to receive a high school diploma. [Id.]

### H. **Compensatory Education**

The DOE contends that the IEPs developed between February 2008 and 2010 offered Student a FAPE. It claims that compensatory education is not warranted here because it is an equitable remedy and is awarded to make up for inadequate services rendered. [Id.]

First, the DOE claims that the Hearings Officer is allowed to refuse compensatory education where he deems it reasonable to conclude, based on Student's prior conduct, that Student will not take advantage of such services if awarded. According to the DOE, the Tenth Circuit Court of Appeals held that compensatory education being an "equitable" remedy, "it was not unreasonable for a school district to deny Student compensatory education where student had demonstrated that she would not take advantage of past services offered to her on prior occasions." [Id. at 30 (citing Garcia v. Bd. of Education, 520

F.3d 1116 (10th Cir. 2008)).]

I. **Methodology Within the DOE's Discretion**

Next, the DOE argues that selection of the specific program to remediate Student's weaknesses is within the discretion of the school district. [Id. at 31 (citing J.L. v. Mercer Island School District, 592 F.3d 938, 952 (9th Cir. 2010)).] It argues that, to the extent Plaintiffs seek reimbursement for a Lindamood-Bell reading program, the selection of a specific methodology is within the sound discretion of the educational district, and therefore, there should not be any reimbursement awarded where the DOE did not select this program. [Id. at 31.]

The DOE also asserts that Student's Stanford Diagnostic Reading Test ("SDRT") scores do not warrant an award for reimbursement of the Lindamood-Bell reading program. In their brief, the DOE asks:

> Also, how do you explain the grade equivalency differential of the DOE's 3.7 grade equivalency obtained by the SDRT administered by the DOE on April 14, 2010 and the 6.0 grade equivalency obtained by the Lindamood-Bell Pre-test on May 28, 2010, just a few months later, and before the Lindamood-Bell course was administered?
>
> The answer may have been provided by the SDRT test administered to Hailey M. on April 14, 2010 (see IEP dated April 20, 2010, Petitioner's Exhibit 22), where Hailey M. was given the test at first under the regulation time and scored a 3.7 grade equivalency and then was allowed to finish the test by giving her extended time as

29

> contemplated by her IEP where she scored a grade
> equivalency of 5.7.

[Id. at 32-33.]  The DOE answers that, "Looking at the extended
time test score result, there is not much difference between the
grade equivalency score obtained by the DOE of 5.7 and the
Lindamood Pre-test grade equivalency score of 6.0."  [Id. at 33.]

In conclusion, Defendants urge the Court to affirm the
Decision.

## IV.  **Plaintiffs' Reply Brief**

In their Reply Brief, Plaintiffs focus on their request
for reimbursement and continued participation in the Lindamood-
Bell reading program.  According to Plaintiffs, the program was
located on Maui and required Student and Mother to commute weekly
from Oahu.  The Lindamood-Bell Clinic's evaluator and director
recommended that Student participate in 480 hours of remedial
instruction, but Mother was only able to afford 170 of those
hours at a tuition cost to her of over $22,000.  Plaintiffs claim
that "[d]espite having to cut the program short, Hailey's pre-
and post-test scores prove her to have made remarkable progress
with her reading skills during her Lindamood-Bell enrollment.
When [she asked the DOE] to reimburse her for the costs and
tuition payments she incurred sending Hailey to this specialized
program, the DOE refused."  [Reply Br. at 2.]

Plaintiffs first take issue with some of the facts as
presented by the DOE.  They state that, although Defendants

acknowledge that the cognitive assessments done by the DOE in 2008 when Student's IDEA category was changed from mentally retarded to specific learning disability were substantially similar to the earlier testing done by Plaintiffs' experts, they fail to mention that those expert assessments had been presented to the IEP team over two years earlier, in 2006, and those results were rejected by the IEP team as an indication that Student should be reevaluated for "specific learning disability" prior to her tri-annual revaluation in 2008.  [Id. at 3-4.]

They also challenge that the decision that Student be in a general education inclusion classroom the first quarter of her ninth grade school year was made, not "at Mother's request," as represented by Defendants, but as a unified IEP team decision, to which both Student and Mother "wholeheartedly agreed." [Id. at 4.]  Plaintiffs also state that "Hailey was devastated when she was abruptly placed back in special education classes after only one semester."  [Id.]

A.   **Whether Student Was Properly Evaluated**

Plaintiffs fault the DOE for not addressing why the 2006 private expert evaluations of Student as learning disabled did not require the IEP team to reassess her mental retardation identification sooner than her scheduled tri-annual evaluation in 2008.  Further, when the DOE changed her category, they did nothing to update or revise her educational plan or goals.

31

Plaintiffs argue that the DOE was required to provide Student with "remediation that would address her basic academic skill training that had been neglected due to her perceived cognitive disability." [Id. at 5.] As a result, they argue that her IEPs were not "needs driven," as claimed by the DOE. [Id. at 6.]

Plaintiffs argue that the DOE's Answering Brief takes inconsistent positions on whether a specific diagnosis is relevant to whether a student receives a FAPE. The DOE argues that the miscategorization of disability is not relevant, but that whether Student has CAPD is relevant to the provision of a FAPE. With respect to the CAPD diagnosis, Plaintiffs assert that the Hearings Officer found the DOE audiologist's testimony to be credible, "despite, and in contradiction of, both Plaintiffs' expert witnesses and multiple expert reports." [Id. at 7.]

### B.    ESY Services Were Inadequate

Next, Plaintiffs assert that the DOE relies on Student's poor attendance to justify the insufficiency of the offered ESY. Plaintiffs note Mother's testimony about the reasons why Student at times refused to go to school, and DOE witness testimony attributing Student's absences to "somatic complaints associated with her perception of school as a stressful and scary place to be." [Id. at 8.]

### C. The IEP Goals and Objectives Were Not Measurable or Meaningful

Plaintiffs claim that Defendant's arguments relating to the IEP goals and objectives being measurable and meaningful are simply recitations of the various IEP goals and objectives over the years, and lack reference to any evidence or testimony as to how these goals were determined to be appropriate, what data was relied upon, or how progress, if any, was to be measured. Plaintiffs argue that the goals do not identify at what academic skill levels Student was currently performing or reference baseline date or standardized test results, and are, therefore, not meaningful or measurable. [Id. at 8-9.]

### D. Least Restrictive Environment

Plaintiffs next reiterate that Student was overwhelmed in the regular education inclusion class, and that, rather than providing additional supports like a one-to-one aide or tutor, the DOE opted to immediately remove Student and return her to a self-contained special education class. [Id. at 9.]

### E. Mother Not Treated as Equal Participating Member

Plaintiffs contend that the DOE continues to unfairly vilify Mother as the cause of Student's school performance and attendance problems. According to Plaintiffs, Mother has "provided numerous outside private educational programs for her daughter, made all such evaluations and test results available to

the entire IEP team, and participated in each and every IEP meeting to the best of her ability." [<u>Id.</u> at 10.]

   **F.**   **<u>Transition Plan Was Not Sufficient</u>**

        According to Plaintiffs, the issue of the transition plan was before the Hearings Officer. Plaintiffs' March 23, 2010 letter to the Hearings Officer identifying specific allegations to be addressed at hearing, concluded with: "In addition, Petitioners intend to prove that despite stated IEP goals for Hailey to graduate with a high school diploma, her IEPs are not designed to provide her with adequate special education and related services for Hailey to make academic progress to achieve this stated goal." [<u>Id.</u> at 10-11.] Plaintiffs argue that the DOE had notice that the transition plan was an issue to be addressed.

        As to the merits, Plaintiffs claim that the DOE fails to explain how Student's "past two years of IEP instruction and services translated into preparing Hailey being academically (sic) for post-high school education." [<u>Id.</u> at 11.] Plaintiffs then ask: "Given that her current reading ability is at or around 4th grade, and she is now entering her 10th grade of school, where in her IEP is the plan that will remediate her skills to the level necessary to elevate her 5 or 6 grade levels in the next two years?" [<u>Id.</u>]

### G. **Compensatory Education**

Plaintiffs contend that the Hearings Officer abused his discretion when he concluded that Student was not eligible for compensatory education based on his assumption that she would not take advantage of such services if awarded. Plaintiffs distinguish the Tenth Circuit case relied upon by the DOE, <u>Garcia v. Board of Education, Albuquerque Public Schools</u>, 520 F.3d 1116 (10th Cir. 2008), in which the student had a history of drug and alcohol problems, was absent for 136 days in one semester alone, and placed in a juvenile correction facility, – all facts that are not applicable in the instant case. [<u>Id.</u> at 13.]

Plaintiffs also state that "Hailey's perfect attendance at her Lindamood-Bell instruction classes over 2010 summer ESY conclusively affirms that when Hailey's educational and self-esteem needs are being appropriately met, she is more than compliant in her attendance and eager to learn." [<u>Id.</u>]

### H. **Selection of Methodology**

According to Plaintiffs, neither Plaintiffs nor Defendants have raised issues of methodology, nor was the appropriateness of the Lindamood-Bell reading program ever challenged by Defendants. There was no issue of competing methodologies because the DOE never offered any alternative remedial programs comparable to the Lindamood-Bell program. [<u>Id.</u> at 14.]

35

With respect to Student's SDRT scores, Plaintiffs note that the DOE has not established that adding extended time to an SDRT examination is a variation authorized by the publisher of the standardized test, or that the resulting score could be considered a valid indication of Student's reading skills.  [Id.]

I.  **Student Was Not Offered a FAPE**

Plaintiffs argue that none of the services offered to Student were individually designed to assist her in gaining educational benefit from her education.  They state specifically, that:

> 1.   The IEP related services that Hailey received at Niu Valley did not adequately address her specific learning disabilities because they were formulated for a mentally retarded student and never revised following Hailey's reclassification. As such, it certainly could not be an appropriate educational plan to continue on at Kalani.
>
> 2.   The accommodations that Hailey received as part of her IEP at Niu Valley did not adequately address her specific learning disabilities, and likewise should have been revised in order to meet her educational needs both at Niu Valley and at Kalani.
>
> 3. The "study skills class" was not individualized instruction, but a "catch-up class" taught by special education teachers to all the special education students.
>
> .  .  .  .
>
> 4.   The morning and afternoon "academic assistance" referenced by Defendants was merely a before-and-after school study hall, open to all Kalani students, and staffed by educational assistants who were not trained to work with students with learning disabilities.

. . . .

>    5.  The Achieve 3000 reading intervention program
>    referenced by Defendants is a computer program
>    designed for use by general high school students
>    who have some difficulty with their reading
>    skills.  It is certainly not the individualized
>    remedial program that would meet someone like
>    Hailey's specialized needs.

[Id. at 16-17.]

In conclusion, Plaintiffs urge the Court to reverse the Decision and award Plaintiffs reimbursement and compensatory education in the form of prospective relief, specifically for attendance in the Lindamood-Bell program.

**STANDARD**

I.   **IDEA Overview**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs."  Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310, 108 S. Ct. 592, 597, 98 L. Ed. 2d 686 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]"  20 U.S.C. § 1400(d)(1)(A).

The IDEA defines FAPE as:

> special education and related services that –
> (A) have been provided at public expense,
> under public supervision and direction, and
> without charge;
> (B) meet the standards of the State
> educational agency;
> (C) include an appropriate preschool,
> elementary school, or secondary school
> education in the State involved; and
> (D) are provided in conformity with the
> individualized education program required
> under section 1414(d) of this title.

20 U.S.C. § 1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP. See generally 20 U.S.C. § 1414. The IEP is to be developed by an "IEP Team" composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the denial of a FAPE." L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted). Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." Id. (citations omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the

38

denial of a FAPE." Id. (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Id. at 433 (citations and quotation marks omitted).

If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency. See 20 U.S.C. § 1415(b)(6), (f)(1)(A). Parents may also send their student to a private program and seek retroactive tuition reimbursement from the state. See Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2493, 2496 (2009) (citations omitted). Where parents unilaterally withdraw a child from public school, they "do so at their own financial risk." Id. at 2496 (citations and internal quotation marks omitted). Parents challenging an IEP are entitled to reimbursement only if "a federal court concludes both

that the public placement violated IDEA and the private school

placement was proper under the Act." Id. (citations and internal

quotation marks omitted); see also 34 C.F.R. § 300.148(c).

## II.  Standard of Review

The standard for district court review of an

administrative decision under the IDEA is set forth in 20 U.S.C.

§ 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the
> court –
>   (i) shall receive the records of the
>   administrative proceedings;
>   (ii) shall hear additional evidence at the
>   request of a party; and
>   (iii) basing its decision on the
>   preponderance of the evidence, shall grant
>   such relief as the court determines is
>   appropriate.

This standard requires that the district court give

"'due weight'" to the administrative proceedings.  L.M. v.

Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009)

(quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v.

Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690

(1982)) (some citations omitted).  The district court, however,

has the discretion to determine the amount of deference it will

accord the administrative ruling.  J.W. ex rel. J.E.W. v. Fresno

Unified Sch. Dist., 626 F.3d 431, 438 (9th Cir. 2010) (citing

Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir.

1987)).  In reaching that determination, the court should

consider the thoroughness of the hearings officer's findings,

increasing the degree of deference where said findings are
"'thorough and careful.'"  L.M., 556 F.3d at 908 (quoting

Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892

(9th Cir. 1995)).  The district court should give "substantial

weight" to the hearings officer's decision when the decision

"evinces his careful, impartial consideration of all the evidence

and demonstrates his sensitivity to the complexity of the issues

presented."  Cnty. of San Diego v. Cal. Special Educ. Hearing

Office, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation and

quotation marks omitted)).  Such deference is appropriate because

"if the district court tried the case anew, the work of the

hearing officer would not receive 'due weight,' and would be

largely wasted."  Wartenberg, 59 F.3d at 891.  "[T]he ultimate

determination of whether an IEP was appropriate," however, "is

reviewed de novo."  A.M. ex rel. Marshall v. Monrovia Unified

Sch. Dist., 627 F.3d 773, 778 (9th Cir. 2010) (citing Wartenberg,

59 F.3d at 891).

   A court's inquiry in reviewing IDEA administrative

decisions is twofold:

> "First, has the State complied with the procedures
> set forth in the Act?  And second, is the
> individualized educational program developed
> through the Act's procedures reasonably calculated
> to enable the child to receive educational
> benefits?"  [Rowley, 458 U.S. at 206-07]
> (footnotes omitted).  "If these requirements are
> met, the State has complied with the obligations
> imposed by Congress and the courts can require no
> more."  Id. at 207.

41

<u>J.L. v. Mercer Island Sch. Dist.</u>, 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling. <u>Hood v. Encinitas Union Sch. Dist.</u>, 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted). The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed. <u>J.W.</u>, 626 F.3d at 438 (citation omitted).

<b><u>DISCUSSION</u></b>

As a general matter, the Court FINDS that the Hearings Officer's findings and conclusions are "thorough and careful" and therefore entitled to increased deference, with some exceptions noted below. <u>See</u> <u>L.M.</u>, 556 F.3d at 908 (citation and internal quotation marks omitted). The Hearings Officer summarized the testimony of the teachers, therapists, and consultants involved in the process, and created a detailed decision explaining his factual findings and legal conclusions. He made specific findings of fact with respect to each issue raised with respect to each of the numerous individual IEPs.

I. **<u>Compliance with the IDEA</u>**

    A. **<u>Whether Student Was Properly and Timely Evaluated</u>**

Plaintiffs acknowledge that the IDEA does not give a student the right to a correct disability classification.

42

[Opening Br. at 15 (citing 20 U.S.C. § 1412(a)(3)(B); 34 C.F.R. 300.111(d)).] The IDEA requires that "each student must be assessed in all areas of his or her suspected disability." J.W., 626 F.3d at 441 (citing 20 U.S.C. § 1414(b)(3)). The Court in J.W. also stated:

> District must reassess a special education student at least once every three years, and not more frequently than one time per year, unless the parents and district agree otherwise. 20 U.S.C. § 1414(a)(2)(b). A reevaluation occurs "if the local educational agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation . . . or if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(1). Reassessment requires parental consent. 20 U.S.C. § 1414(c)(3).

Id. at 443 (some citations omitted).

Here, the DOE reevaluated Student in 2008, and changed her classification from mental retardation to specific learning disability. To the extent Mother requested revaluation in 2006, Plaintiffs' claims fall outside the limitations period – that is, before February 8, 2008 – and their claims relating to the failure to reevaluate Students's disability category are barred. Haw. Rev. Stat. § 302A-443.

To the extent Plaintiffs claim that Student's change of eligibility category in 2008 to Specific Learning Disability required the DOE to provide Student with "remediation that would address her basic academic skill training that had been neglected

due to her perceived cognitive disability," [Opening Br. at 5,] the Court disagrees.  Based on the 2008 evaluations, the IEP team found that Student was weak in reading comprehension, writing, math, expressive speech, receptive speech and demonstrated a need for counseling.  [ROA at HM 047.]  Further, Randi Passantino, Student's Niu Valley special education teacher, testified that Student's needs did not change because of a change in her classification.  [ROA, 9/23/10 Trans., at 687.]  Reviewing the individual IEPs at issue and the testimony at the hearing below, Court finds that the IEPs addressed Student's unique educational needs, regardless of her disability classification, and were "needs driven."  The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof as to their arguments regarding evaluation and classification of Student.

**B.**  **Whether Student's ESY Program Was Appropriate**

Plaintiffs claim that the IEPs' ESY descriptions offer no specific location of services, duration of services or type of educational setting being offered, and therefore, the IEPs are procedurally defective.  They argue that, where the IEPs stated services were "to be held on campus" they were insufficient.

"The IDEA requires a clear written offer that sets forth a sufficiently specific statement of what the actual offered services will be."  A.B. v. San Francisco Unified Sch. Dist., No. C 07-4738 PJH, 2008 WL 4773417, at *15 (N.D. Cal. Oct.

30, 2008).  "The offer must also include a statement of the anticipated frequency, location and duration, as well as sufficient information so that the level of the district's commitment of resources is clear, although the offer may be stated in a range if a range of services meets the student's needs."  Id. at *14 (citing 20 U.S.C. § 1415(b)(3)(A)).

The August 1, 2008, October 24, 2008, and April 9, 2009 IEPs indicate that Student is eligible to receive ESY services, but do not reference the specific services or when or where Student's ESY program is to be.  Student's Special Education Teacher for ESY services for the summer of 2008, Ms. Passantino, testified that Student attended summer school for four hours each day that summer.  [ROA, 9/23/10 Trans., at 692-94; ROA at HM 353 (ESY Summer Report 2008).]  Ms. Passantino also testified that the IEP team felt that Student would not need ESY services during the October 2008 intersession, because the data did not show any regression with respect to the services being provided to Student.  [ROA, 9/23/10 Trans., at 694.]  In fact, Ms. Passatino testified that Student did not show any regression or recoupment issues upon returning from the October 2008 interssion:

> Then as the October intersession – that was for
> the August meeting, and then when the October
> intersession passed, October interssession was – I
> want to say, one week, so she came back on the
> eighth or ninth day and she was fine.  She was
> able to do the work, she was able to continue
> right where she left off[.]

45

[Id. at 714.]  The Court finds no procedural error in failing to detail ESY services because they would not be offered to Student during the October 2008 interssession.

To the extent Plaintiffs argue that the May 21-22, 2009 IEP, and subsequent IEPs with identical language, do not adequately define the ESY program offered, the Court disagrees. The May 22, 2009 IEP states:

> Due to [Student's] emerging skills in reading comprehension and math computation/reasoning, [Student] requires ESY services during the regular DOE summer session for 2 hours a day to appropriately address her academic goals and benchmarks.  In addition to special education [Student] will receive 30 minutes a week of speech therapy to address speech/language goals and objectives.
>
> [Student] will also receive extended school day services for 56.15 hours a quarter to address appropriate academic goals and benchmarks.

All services to be provided on a DOE school campus.

[ROA at HM 132.]  Student's special education teachers from Niu Valley and Kalani attended this IEP meeting, and Ms. Passantino testified that the meeting participants discussed that Student would be getting ESY services during the summer session at Kalani for two hours per day.  [ROA, 9/23/10 Trans., at 717-18.]  In light of the discussion of ESY and speech services to be provided at Kalani during the summer 2009 intersession, combined with the description in the IEP, the Court finds that the description of ESY services is sufficiently detailed to provide notice of the

anticipated frequency, location and duration, as well as sufficient information so that the level of the DOE's commitment of resources is clear.

Finally, to the extent the Hearings Officer ruled that, based on Student's past attendance record any award of ESY would have been futile, the Court does not accord this finding increased deference, as it was not necessary to determine that the DOE complied with the requirements of the IDEA. The Hearings Officer concluded that Student had a poor attendance record during the Summer 2009 ESY, when she attended eight sessions and was absent sixteen times. [Decision at 58.] He unnecessarily relied on Student's attendance record to conclude as follows: "For the reasons stated above, the Hearings Officer finds that the ESY Programs offered by Respondent, and often rejected through non-attendance by Petitioners, are appropriate to meet the unique needs of the Student." [Id. at 60.] The Court agrees with the Hearings Officer that the IEPs sufficiently addressed Student's ESY program, but does not agree that Student's absences were relevant to determining whether the IEPs complied with the requirements of the IDEA.

The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof with respect to their argument regarding procedural deficiencies in the ESY services.

**C.  Goals and Objections Were Measurable and Meaningful**

Plaintiffs argue that the goals and objectives portions of the IEPs are defective because they do not contain appropriate baselines.  They fault the DOE for failing to address how the goals were determined to be appropriate, what data was relied upon, or how progress was to be measured.  Plaintiffs presented the testimony of their Lindamood-Bell expert, Ms. Cranyon, that the IEP's goals were very broad and general.  [ROA, 9/22/10 Trans., at 373-376.]

The Hearings Officer, however, found that:

> despite Petitioners' Lindamood Bell expert's testimony to the contrary, the annual goals in the instant IEP are measurable and meaningful.  The Hearings Officer notes particularly that Petitioners' Lindamood-Bell expert, pursuant to her resume, states she "[I]ncreased student contracts paid by the Department of Education of New York City by testifying at impartial hearings from 0-25% of the student roster."  PE 54, page 000398[.]

[Decision at 52-53.]

The IDEA requires, with respect to present levels of educational performance ("PLEPs") and goals, that the IEP include:

> (I) A statement of the child's present levels of academic achievement and functional performance, including-
>
>> (aa) how the child's disability affects the child's involvement and progress in the general education curriculum;
>>
>> . . .

48

(II) a statement of measurable annual goals,
including academic and functional goals, designed
to-

> (aa) meet the child's needs that result from
> the child's disability to enable the child to
> be involved in and make progress in the
> general education curriculum; and

> (bb) meet each of the child's other
> educational needs that result from the
> child's disability;

(III) a description of how the child's progress
toward meeting the annual goals described in
subclause (II) will be measured and when periodic
reports on the progress the child is making toward
meeting the annual goals (such as through the use
of quarterly or other periodic reports, concurrent
with the issuance of report cards) will be
provided.

20 U.S.C. § 1414(d)(1)(A)(i).[2]  Student's IEPs, and in

particular, the sections entitled "Present Levels of Educational

Performance" and "Annual Goal," conformed to these requirements.

---

[2] Similarly, Haw. Admin. R. § 8-56-38 requires the IEP to
include:

> (1) A statement of the student's present levels of
> educational performance, including:
>> (A) How the student's disability affects the
>> student's involvement and progress in the
>> general curriculum;
>> . . .
> (2) A statement of measurable annual goals,
> including benchmarks or short-term objectives
> related to:
>> (A) Meeting the student's needs that result
>> from the student's disability to enable the
>> student to be involved in and progress in the
>> general curriculum, . . . and
>> (B) Meeting each of the student's other
>> educational needs that result from the
>> student's disability[.]

For example, the December 2, 2009 IEP's PLEPs portion indicates the reading assessment used ("SDRT 4th Ed. - Brown Level (Gr. 6.5-8.9)"), and her scores ("Reading Comprehension – GE 3.2, Vocabulary – GE 3.6"), and notes the scores for other programs and assessments recently used to evaluate Student ("HSA Scores," "SRA," and Student's SONDAY program level). [ROA at HM 239.] The IEP also added observations from Dr. Murphy-Hazzard's October 15, 2009 neuropsychological evaluation and feedback from her teachers at Kalani to the PLEPs. [Id.] The PLEPs section includes observations regarding Student's attendance, behaviors at school, her reading strengths and needs, writing strengths and needs, math strengths and needs, speech and language strengths and needs. [Id. at HM 239-41.] The PLEPs also include a statement of Parent Concerns. [Id. at HM 241.] The IEP also contains Annual Goals in the following categories: "Career and Technical Education," "Math," and "Language Arts." Under each of these categories, the IEP includes measurable annual goals, indicating how progress toward the annual goal will be measured, and the benchmark/short-term objectives for each. [Id. at HM 243-49.]

The Court has reviewed the testimony in the record, including Plaintiffs' experts, and the relevant portions of the IEPs, and rejects Plaintiffs' claim that the goals are immeasurable. The goals and benchmarks are specific, capable of

measurement and directly relate to Student's areas of weakness identified in the PLEPs. Finally, the IEPs clearly included the required description of how Student's progress toward meeting the annual goals would be measured and when periodic reports would be provided. See 20 U.S.C. § 1414(d)(1)(A)(i)(III). In sum, the Court finds that the IEP complied with § 1414(d)(1)(A)(i), the IDEA's requirements with respect to the PLEPs, goals and objectives. The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof as to their argument regarding whether goals and objectives were measurable and meaningful.

D. **Whether Student's Placement Was in the Least Restrictive Environment**

Plaintiffs argue that Student was not placed in the least restrictive environment when she was taken out of the Kalani general inclusion classroom, and placed into a self-contained special education classroom, rather than being provided with additional supports so that Student could stay in the inclusion classroom. The Hearings Officer concluded that Student's placement in the ACE diploma class was appropriate to meet Student's needs and did not violate the IDEA's least restrictive environment mandate. [Decision at 65.]

A state must ensure that,

to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational

51

environment occurs only when the nature or
severity of the disability of a child is such that
education in regular classes with the use of
supplementary aids and services cannot be achieved
satisfactorily.

20 U.S.C. § 1412(a)(5)(A); see also Haw. Admin. R. § 8-56-43.

("The department shall ensure that to the maximum extent

appropriate, all students with a disability . . . are educated

with students without a disability."). While efforts should be

made to place a student in the least restrictive environment, the

least restrictive environment must also conform to the student's

IEP. Cnty of San Diego v. Cal. Special Educ. Hearing Office, 93

F.3d 1458, 1467-68 (9th Cir. 1996).

Here, Student's IEP team made an effort to mainstream

Student in an a general inclusion classroom in accordance with

the least restrictive environment mandate. Testimony clearly

indicated that Student did not thrive in the general inclusion

classroom, and could not keep up with the pace of the class, even

with accommodations. The Court agrees with the Hearings

Officer's conclusion that Plaintiffs' argument that Student's IEP

team "should have explored the effectiveness of regular education

with supplemental aids and services," is not supported by the

record. [Decision at 64.] "Student was placed in the regular

education setting with numerous accommodations and supplemental

aids and services, to include that of an aide that worked

exclusively with Student, and Student did not perform well."

[<u>Id.</u>] There is no evidence that additional supports would have changed this. In this instance, it was not error to conclude that the mainstream classroom was inappropriate, and to move Student to the ACE diploma class. The Court CONCLUDES that Plaintiffs have failed to meet their burden of proof as to their argument based on the least restrictive environment.

     **E.**    <u>**Whether Mother Was Treated As an Equal Participant of Student's IEP Team**</u>

Plaintiffs fault the DOE and the Hearings Officer for vilifying Mother as the cause of Student's poor performance and as demanding during the IEP process. Mother has provided extensive private educational programs for Student at her own expense, made all evaluations and test results available to the entire IEP team, and participated in all IEP meetings. To the extent the Hearing's Officer portrayed Mother as becoming litigious when the IEP team refused to agree to her demands, the Court does not find support for this statement in the record, and does not accord this finding increased deference.

The Hearings Officer further found that:

Student's Special Education Teacher testified persuasively that:

> A. Mom was present at all IEP meetings. During the IEP meeting, especially in the PLEP, we did ask if there were any parent concerns. Whenever we went over every part of the IEP, it was asked if mom had any questions or concerns in regards to the goals and objectives, in regards to services. We did spend a lot of time on the services page

> because mom wanted to focus on that page in
> regards to Student's needs.
>
> TOP, Vol. IV, page 710, lines 24-25 and page 711,
> lines 1-6

[Decision at 26.] He concluded that Mother was not denied full

participation, as follows:

> Essentially, Petitioners are claiming that failure
> of the remaining IEP team members to "rubber
> stamp" each of Mother's demands into the IEP
> results in "not including Mother as a full member
> of the IEP team." There is no such mandate under
> the IDEA. The Court in <u>Laddie C. v. Department of
> Education, State of Hawaii</u> 52 IDELR 102 (United
> States District Court (2009)) rejected the
> argument that parent was denied full participation
> in the placement process observing that the
> existence of a difference of opinion between the
> parent and the remaining members of the IEP Team
> is not sufficient to support such an allegation.

[<u>Id.</u> at 28.]

The Court FINDS that the record does not show that

Mother was denied meaningful participation in the IEP process.

School districts have an affirmative obligation to take steps to

ensure that parents of a student are present at IEP meetings or

otherwise have the opportunity to participate. 34 C.F.R. §

300.322(a). This obligation includes scheduling a meeting at a

mutually agreed upon time and place, providing reasonable notice

of this meeting, and using alternative methods, such as

individual or conference telephone calls, to ensure parent

participation. § 300.322(a)-(c).

The IEP team met fifteen times between February 2008

and January 2010.  Mother was present at every IEP meeting –
indeed, several of the meetings were called at her request – and
Mother was an active and engaged participant.  The IEPs contain
detailed entries listing parental concerns.  Although the DOE did
not agree with all of Mother's concerns and suggestions, the DOE
did not deny Mother meaningful participation in the IEP process.
The Court CONCLUDES that Plaintiffs have failed to meet their
burden of proof as to their argument based on the lack of
parental participation.

     **F.**    **<u>Whether the Transition Plan Was Raised Below</u>**

     Plaintiffs argue that the transition plan portion of
Student's IEPs is insufficient to achieve her goal of attending
college after high school.  The Hearings Officer ruled that the
"issue of Student's transition plan was never brought up as an
issue in Petitioners' request for impartial hearing.  As such,
Petitioners' will not be permitted to raise this issue after the
fact."  [Decision at 63.]  Plaintiffs argue that the DOE had
notice that the sufficiency of the transition plan was at issue
because Plaintiffs' March 23, 2010 letter to the Hearings Officer
stated that "Petitioners intend to prove that despite state IEP
goals for [Student] to graduate with a high school diploma, her
IEPs are not designed to provider her with adequate special
education and related services for [Student] to make academic
progress to achieve this stated goal."  [ROA at 23.]

As a general rule, administrative review of IDEA cases is specifically limited to the issues raised in the administrative complaint.  <u>Cnty. of San Diego v. Cal. Special Educ. Hearing Office</u>, 93 F.3d 1458, 1465 (9th Cir. 1996) ("The scope of the administrative hearing mandated by [former] section 1415(b)(2)[3] is limited to the 'complaint' raised to obtain the hearing.").  Section 1415(f)(3)(B) codified this holding, providing that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise."

The Court agrees with the Hearings Officer's determination that the issue of the sufficiency of the transition plan was not raised in Plaintiffs' RIH or their subsequent March 23, 2010 letter clarifying the RIH.  The Hearings Officer did not examine the issue, and there is insufficient evidence or discussion for the Court to consider the matter.  <u>See, e.g.</u>, <u>B.T. v. Hawaii Dep't of Educ.</u>, 676 F. Supp. 2d 982, 988 (D. Hawai'i 2009) (citing <u>J.L. v. Mercer Island Sch. Dist.</u>, 575 F.3d 1025, 1038 (9th Cir. 2009)) (denying review of an IDEA claim due to "insufficient evidence or discussion" of the matter at the administrative level).  The Court CONCLUDES that Plaintiffs have

---

[3] The current section governing the subject matter of due process hearings is 20 U.S.C. § 1415(f)(3)(B).

failed to meet their burden of proof as to their argument regarding whether the sufficiency of the transition plan is properly before the Court.

        **G.**    <u>**FAPE**</u>

        Plaintiffs argue that Student was denied a FAPE because her ESY program was not appropriate, while the Lindamood-Bell Summer Clinic was the appropriate summer ESY placement for Student. The Hearings Officer found that Plaintiffs did not prove by a preponderance of the evidence that the DOE did not provide Student with a FAPE between February 8, 2008 and February 8, 2010 or that Student's proposed placement was inappropriate. [Decision at 67.] The Court agrees with the Hearings Officer.

        The IDEA relies heavily upon the expertise of school districts to meet its goals and this Court will not substitute its own judgment of sound educational policy for that of the educational authorities. <u>Cnty. of San Diego</u>, 93 F.3d at 1466. Although the Plaintiffs are not satisfied with the DOE's offer of FAPE, an IEP need not conform to a parent's wishes in order to be sufficient or appropriate. <u>See Shaw v. District of Columbia</u>, 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (stating that the IDEA does not provide for an "education . . . designed according to the parent's desires") (citation omitted).

        The Court notes that a FAPE need not provide the "absolutely best" or "potential-maximizing" education. <u>J.W. ex</u>

rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Id. at 433 (citations and quotation marks omitted). Reviewing the numerous IEPs at issue in this matter, the Court agrees with the Hearings Officer that the DOE's offers of FAPE relating to the proposed programs and placement of Student between February 8, 2008 and February 8, 2010 were designed and implemented to allow Student to achieve meaningful educational gains in the least restrictive environment. Although Plaintiffs argue that none of the services offered to Student were individually designed to assist her in gaining educational benefit from her education, the Court does not find support in the record for this claim. The Court is sympathetic to Plaintiffs' view that the Lindamood-Bell Clinic and other private service providers allowed Student to make remarkable progress with her reading skills. The Court also understands Plaintiffs' frustration that Student has not made greater progress in the DOE's programs. The IDEA, however, does not require States to "maximize each child's potential commensurate with the opportunity provided other children," but only to "enable the child to receive educational benefits." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 198, 207 (1982) (footnote omitted).

The Court notes that, throughout the proceedings, Mother has sought, as all good parents do, to secure the best services for her child. Student's recent progress in reading is commendable, and a credit to her hard work, Mother's commitment and devotion, and the proficiency and excellence of her private teachers and therapists. The role of the district court in IDEA appeals, however, is not to determine whether an educational agency offered the best services, but whether the services offered confer the child with a meaningful benefit. Further, while the parties appear divided by honest differences of opinion, the Court finds compelling evidence that the DOE constructed an individualized program tailored to meet Student's educational, developmental, and functional needs. Based on the preponderance of the evidence, the Court therefore CONCLUDES that the DOE offered Student a FAPE in compliance with the IDEA.

## II.  Request for Compensatory Education

Finally, Plaintiffs seek compensatory education and reimbursement for private programs and related expenses.

The Ninth Circuit has explained that:

> Compensatory education services can be awarded as appropriate equitable relief. 20 U.S.C. § 1415(i)(2)(B)(iii) ("shall grant such relief as the court determines appropriate"); Parents of Student W. v. Puyallup Sch. Dist., 31 F.3d 1489, 1496-97 (9th Cir. 1994). Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the [Individuals with Disabilities Education Act]. The courts have discretion on how to craft the

> relief and "[t]here is no obligation to provide a
> day-for-day compensation for time missed."  We
> review the Hearing Officer's and the district
> court's award of compensatory education services
> for abuse of discretion.

Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1033 (9th

Cir. 2006) (some citations and quotation marks omitted).  Here,

compensatory education is not made necessary by any denial of a

FAPE, and the Court declines to award compensatory education at

this time.

Nor are Plaintiffs entitled to reimbursement in this

instance.  Under 34 C.F.R § 300.148(c), reimbursement for private

school expenditures is available:

> [i]f the parents of a child with a disability, who
> previously received special education and related
> services under the authority of a public agency,
> enroll the child in a private preschool,
> elementary school, or secondary school without the
> consent of or referral by the public agency, a
> court or a hearing officer may require the agency
> to reimburse the parents for the cost of that
> enrollment if the court or hearing officer finds
> that the agency had not made FAPE available to the
> child in a timely manner prior to that enrollment
> and that the private placement is appropriate.

Parents who unilaterally transfer a child from a public

school to a private school usually do so "at their own financial

risk."  Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496

(2009) (citations and internal quotation marks omitted).  Because

Plaintiffs did not prove that the IEPs were defective, the Court

FINDS that Plaintiffs are not entitled to reimbursement for

expenses incurred the Lindamood-Bell Summer Clinic.  The Court

therefore DENIES Plaintiffs' request for compensatory education and reimbursement.

<b><u>CONCLUSION</u></b>

On the basis of the foregoing, the Hearings Officer's Findings of Fact, Conclusions of Law and Decision, filed November 12, 2010, is HEREBY AFFIRMED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 7, 2011.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**HAILEY M., et al. v. MATAYOSHI, et al.; CIVIL NO. 10-00733 LEK-BMK; ORDER AFFIRMING THE HEARINGS OFFICER'S NOVEMBER 12, 2010 DECISION**